UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| SHARI L. THOMPSON, | ) | CIV. 12-4113-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND REMANDING |
| | ) | DECISION OF COMMISSIONER |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Shari L. Thompson, seeks review of the Commissioner of Social Security's decision denying her claim for supplemental security income (SSI).[1] The Commissioner opposes the motion and moves the court to affirm the decision. The court reverses and remands.

**PROCEDURAL HISTORY**

On November 3, 2008, Thompson applied for SSI alleging disability since June 1, 2004, resulting from fibromyalgia, chronic back pain, a broken right wrist, carpal tunnel syndrome in both wrists, and arthritis. AR 64-65.[2] The Social Security Administration denied Thompson's application. AR 66-68.

---

[1] Under Fed. R. Civ. P. 25(d), Carolyn W. Colvin is automatically substituted for Michael J. Astrue. This action survives the substitution. 42 U.S.C. 405(g).

[2] All citations to "AR" refer to the appropriate page of the administrative record.

Thompson requested reconsideration, which was subsequently denied. AR 69-72. Thompson requested a hearing before an Administrative Law Judge (ALJ). AR 72. After the ALJ held a hearing, he issued a decision finding that Thompson was not disabled and thus was not entitled to SSI benefits. AR 12-24. Thompson then requested that the Appeals Council review the ALJ's decision, which request was denied. AR 1-6. Subsequently, Thompson commenced this action, requesting judicial review of the Commissioner's determination that she is not disabled. Docket 1.

## FACTS

Thompson was born on June 1, 1962. AR 112. At the time of the hearing before the ALJ, Thompson was 48 years old. Thompson finished high school in 1980 and completed a two-year graphic arts program at a trade school in 1992. AR 142. Thompson has three children. AR 35.

Thompson has worked as a balloon painter, a picture framer, a food deliverer, and a grounds maintenance employee. AR 154-161. Her work and income have been sporadic since 1991. AR 120. Her highest income was in 1994 and 1995, when she worked as a picture framer and made $8,828.57 and $8,722.05, respectively. AR 120. Most recently, Thompson was employed by Lloyd Properties, where she worked between five and ten hours a week picking up trash and maintaining flower beds at an apartment property where she lived. AR 37, 155. She made $1,267 in 2002, $1,454.27 in 2003, $723.31 in

2

2004, and $263.33 in 2005, the most recent year in which she worked. AR 120. Thompson stated that in 2005 the apartment building changed management and she was no longer able to work there because she could no longer work at her own pace. AR 136. Thompson currently relies on child support payments, food stamps, and Section Eight housing benefits for support. AR 37-38.

In her SSI application, Thompson claimed a disability based on fibromyalgia and chronic back problems. AR 64. Thompson also alleged problems associated with a previously broken right wrist, carpal tunnel syndrome in both wrists, and arthritis. AR 136; Docket 11 at 2. Medical records indicate that Thompson has a history of asthma, allergies, weight problems, and smoking. AR 204-05, 207, 209-10, 229, 230, 231, 232, 237, 238-39, 241.

## I.    Fibromyalgia

Thompson states that she has been suffering from fibromyalgia since approximately 1992. AR 39. Fibromyalgia is a "syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." Stedman's Medical Dictionary 725 (28th ed. 2006). The earliest indication of Thompson's fibromyalgia in the record is a visit to Dr. Joseph Fanciullo at the Orthopedic Institute on March 14, 2007. AR 326. Dr. Fanciullo saw Thompson on numerous occasions over the next year when

3

she would experience pain and other symptoms of fibromyalgia. AR 291, 299, 303, 304, 305, 306, 314, 318, 319, 323, 325, 326. Based on his observations of Thompson, Dr. Fanciullo concluded that Thompson would be unable to work full time as a result of her chronic fibromyalgia. AR 299, 300.

Thompson also saw Dr. Robert Wenger for a number of conditions, including her fibromyalgia symptoms, beginning on November 8, 2007. AR 242. Dr. Wenger also diagnosed Thompson with fibromyalgia. AR 229, 230, 231, 233, 238, 331, 332, 336, 341, 343-44, 345, 347. Many of Thompson's visits to Dr. Wenger concerned ailments such as asthma and bronchitis. Thompson used a number of different prescription medications to manage her pain, and Dr. Wenger was primarily responsible for prescribing those medications. AR 324. Other treating physicians noted Thompson's history of fibromyalgia as well. AR 245.

## II.   Chronic Back Problems

Thompson consistently has complained of back pain to her physicians. On November 14, 2007, she told Dr. Wenger that she had pain in her back radiating down her right side. AR 242. Dr. Wenger gave her pain injections and additional pain medication and referred her to Dr. McKenzie. AR 241-42. On June 20, 2008, Thompson visited Dr. Wenger for a flare-up of her back pain stemming from moving a portable pool. AR 236. Dr. Wenger gave her another pain injection and recommended Thompson ice the affected area and rest. *Id.*

4

Dr. Fanciullo also treated Thompson for back pain. On March 14, 2007, Dr. Fanciullo stated that Thompson suffered from "chronic back pain" but noted that it had improved with physical therapy. AR 326. On October 29, 2007, Thompson complained of neck pain to Dr. Fanciullo, but he declined to order an MRI of her entire spine at that time. AR 318.[3]

Dr. McKenzie saw Thompson on December 10, 2007, for Thompson's back pain. AR 321. Dr. McKenzie stated that Thompson reported sciatica pain over the last twelve to eighteen months. *Id.* Thompson told Dr. McKenzie that physical therapy did not help her much, but she did benefit from warm water therapy and chiropractic visits to Dr. Kevin Vandenberg. *Id.* After examination, Dr. McKenzie found that Thompson's "lumbar range of motion is limited to a mild degree in all planes, but not excessively so." *Id.* Dr. McKenzie also stated that Thompson had "mild narrowing at the 5-1 discs" and he would order an MRI of her back. *Id.*[4]

---

[3] A "magnetic resonance imaging" test, or an MRI, is a "test that uses a magnetic field and pulses of radio wave energy to make pictures of organs and structures inside the body." WebMD, http://www.webmd.com/a-to-z-guides/magnetic-resonance-imaging-mri (last visited August 29, 2013).

[4] "Spinal discs are soft, compressible discs that separate the interlocking bones (vertebrae) that make up the spine. The discs act as shock absorbers for the spine, allowing it to flex, bend, and twist." WebMD, http://www.webmd.com/back-pain/tc/degenerative-disc-disease-topic-overview (last visited August 29, 2013). The 5-1 disc is the disc between the fifth vertebra of the lumbar (lower) region of the spine and the first vertebra of the sacral region. Stedman's Medical Dictionary 2118 (28th ed. 2006).

The MRI of Thompson's back showed dehydration changes in three discs that were not severe, and a herniation of one disc that displaced the nerve root. AR 321. Dr. McKenzie recommended an epidural block on January 23, 2008, which was performed on the following week. *Id.* On March 12, 2008, Thompson was seen for a followup of her epidural procedure. AR 320. She stated that the pain in her leg was gone but she had generalized pain in her back. *Id.* Dr. McKenzie, however, stated that those problems were not due to her discs. *Id.* He recommended painkillers and a pool therapy program. *Id.*

On October 27, 2008, Dr. Fanciullo saw Thompson and diagnosed her with, among other conditions, "chronic low back pain and degenerative lumbar spondylosis." AR 314.[5] At that time, Dr. Fanciullo stated he would reorder water exercise after a followup examination. *Id.* On January 22, 2009, Dr. Fanciullo recommended that Thompson continue her aquatic exercise and try a transcutaneous electrical nerve stimulation (TENS) unit. AR 306.[6] A month later, on February 26, 2009, Dr. Fanciullo noted that Thompson got "some

---

[5] Degenerative lumbar spondylosis is a degeneration in the lower area of the spine that results in pain, although it can refer generically to a number of causes for the pain and a number of different degenerative conditions. Kimberly Middleton and David E. Fish, *Lumbar spondylosis: clinical presentation and treatment approaches*, June 2009 Current Reviews in Musculoskeletal Medicine 94 (2009), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2697338/ (last visited August 29, 2013).

[6] A TENS unit is a back pain treatment that uses low voltage electric current to relieve pain. WebMD, http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited August 29, 2013).

benefit from a TENS unit, so she wants to continue with that." AR 305. He further reported that Thompson "finds that when she soaks in the hot tub she feels better" and she was interested in putting one in her home. *Id.* In two separate followup appointments, Dr. Fanciullo references Thompson's degenerative spinal condition and prescribed pain medication, but took no additional steps to treat Thompson's back. AR 303, 304.

In addition to those treatments by Drs. Wenger, Fanciullo, and McKenzie, Thompson was seen at Avera McKennan for an MRI of her neck on November 9, 2007. AR 257. She reported headaches, and the MRI showed "multilevel degenerative disc disease and disc herniations . . . ." *Id.* Thompson was also treated for back and neck pain on eleven occasions at Reinecke Chiropractic Clinic between December 28, 2007 and November 26, 2008. AR 220-25.

## III.   Asthma and Allergies

Thompson has a long history of asthma, sinusitis, and bronchitis, and has seen Dr. Wenger numerous times for exacerbations of those problems. AR 329, 330, 332-33, 333-34, 334, 336, 339, 341-42, 343, 344-45, 346. Throughout his treatment of Thompson, Dr. Wenger noted that Thompson is a regular smoker, and he routinely encouraged Thompson to stop smoking. AR 329, 332, 334, 338, 340-41, 341-42, 344-45. Dr. Bubak at Dakota Allergy and Asthma tested Thompson for allergies. He determined that Thompson was allergic to dust mites and cockroaches and mildly allergic to weeds and cats. AR 204. Dr. Bubak

recommended that Thompson wash her bedding in hot water weekly, not own

cats, keep her house closed up, and use over-the-counter medications to relieve

her symptoms. AR 205. Along with giving Thompson recommendations for

dealing with her allergies, Dr. Bubak also recommended that Thompson stop

smoking to control her asthma. *Id.*

## ALJ DECISION

On August 20, 2010, the ALJ issued a decision denying Thompson's

application for SSI. AR 15-24. The ALJ used the sequential five-step evaluation

process.[7] At the first step, the ALJ determined that Thompson did not engage in

substantial gainful activity since November 3, 2008. AR 17. At step two, the ALJ

found that Thompson has the following severe impairments: fibromyalgia,

asthma, and obesity. AR 17. The ALJ made no findings about the severity of

Thompson's degenerative lumbar spondylosis, her broken right wrist, her

bilateral carpal tunnel syndrome, or her arthritis in step two. AR 17. At step

three, the ALJ determined that Thompson's asthma was a listed impairment, but

it fell short of the requirements for a presumptive disability. AR 17. The ALJ

---

[7] An ALJ must follow " 'the familiar five-step process' " to determine
whether an individual is disabled: "(1) the claimant was employed; (2) she was
severely impaired; (3) her impairment was, or was comparable to, a listed
impairment; (4) she could perform past relevant work; and if not, (5) whether she
could perform any other kind of work." *Martise v. Astrue*, 641 F.3d 909, 921 (8th
Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)); *see
also* 20 C.F.R. § 416.920 (detailing the five-step process).

8

found that there was no listing for fibromyalgia but considered it to be a severe disability. He also considered Thompson's obesity and its association with her fibromyalgia. AR 18. At step four, the ALJ concluded that Thompson has the residual function capacity (RFC) to perform light work. AR 18.[8] The ALJ also decided that Thompson could not perform any past relevant work. AR 22. But the ALJ found that Thompson's claims relating to her limitations and the extent of her pain were inconsistent with her activities and were not fully credible. AR 19. At step five, the ALJ determined that Thompson could perform other jobs that exist in significant numbers in the national economy. AR 23. Therefore, the ALJ concluded that Thompson was not disabled.

## STANDARD OF REVIEW

The court must uphold the decision of the ALJ if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g) ("The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's

---

[8] The ALJ included the following statements of limitation: "[Thompson] has unlimited gross and fine manipulation. She is limited to occasional overhead lifting and frequent use of grasping, grip feeling, and handling. She can occasionally climb stairs, but no ladders, ropes, scaffolds, or running. Further, she can occasionally bend, stoop, crouch, crawl, balance, twist, and squat. She should have limited exposure to dust, fumes, gases, chemicals, unprotected heights, dangerous machinery, and uneven surfaces." AR 18.

conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006)). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). The Commissioner must support her decision with substantial evidence on the record as a whole. *Evans v. Shalala*, 21 F.3d 832, 833 (8th Cir. 1994).

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments; (5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d

581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commissioner's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

### I.   Step Two

Thompson argues that the ALJ improperly omitted her degenerative lumbar spondylosis from her list of medically determinable impairments at step two of the sequential five-step evaluation, which omission also led to errors at steps three and four. Docket 11 at 31-32, Docket 17 at 1-3. At step two, Thompson must establish whether she has a medically determinable physical or mental impairment that is severe. 20 C.F.R. § 416.920(a)(4)(ii); *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that [her] impairment or combination of impairments are severe.") (citation omitted). A severe impairment must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. § 416.920(c), such as walking,

standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, understanding, remembering simple instructions, using judgment, responding appropriately to usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 416.921(b)(1)-(6). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b).

The Commissioner states that the function of step two is merely to weed out those who cannot establish a disability, and that as long as the ALJ finds one severe impairment and advances to the next step, there is no error. Docket 16 at 10 (citing *Dray v. Astrue*, 353 F. App'x 147, 149 (10th Cir. 2009)). But the Eighth Circuit Court of Appeals has not adopted the standard articulated in *Dray*. To the contrary, in *Nicola v. Astrue*, 480 F.3d 885, 886-87 (8th Cir. 2007), the Eighth Circuit found that failure to identify a severe impairment at step two, even though the ALJ found multiple other severe impairments, was reversible error. Furthermore, the holding in *Dray* is distinct from this case. In *Dray*, the ALJ considered the claimant's depression and found that it was not severe. That express determination is different from the ALJ's decision in this case, where he made no findings at all regarding the existence of Thompson's degenerative lumbar spondylosis or its severity. Because Thompson's back problems in general are her primary limitation, it was error to omit her degenerative lumbar spondylosis from consideration at step two. *See Nicola*, 480 F.3d at 887 ("[W]e reject the Commissioner's argument of harmless error [at step two]."). On

12

remand, the ALJ should consider whether Thompson's degenerative lumbar spondylosis is a medically determinable impairment, and if so, whether it is severe.

## II.    Step Three

The ALJ's failure to include Thompson's degenerative lumbar spondylosis at step two led to an error of omission at step three. First, the ALJ never considered whether her degenerative lumbar spondylosis met or equaled one of the listed impairments in step three, which would require a finding of disability. "There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments so long as the overall conclusion is supported by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (citing *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003)). In this case, though, the ALJ made no finding about Thompson's degenerative lumbar spondylosis. It is unclear if the ALJ concluded that her degenerative lumbar spondylosis was not severe, if he considered those symptoms along with her fibromyalgia, or if he simply omitted it altogether. On remand, if the ALJ determines that Thompson's degenerative lumbar spondylosis is a severe medically determinable impairment, he should consider whether it meets or equals the requirements for a finding of disability under the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

### III.    Step Four

Thompson argues that the ALJ's determination of her RFC is not supported by the record as a whole. A claimant's RFC "is the most [she] can still do [in a work setting] despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC assessment is an indication of what the claimant can do on a "regular and continuing basis" given the claimant's disability. 20 C.F.R. § 404.1545(b). "The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006). " '[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.' " *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citing *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). Thompson contends that the ALJ erred in five specific ways in determining her RFC at step four: failing to properly analyze her fibromyalgia, failing to include limitations from her degenerative lumbar spondylosis, improperly considering her failure to quit smoking as a failure to follow a treatment plan, improperly giving too little weight to the opinion of Dr. Fanciullo, and basing the RFC on improper medical opinions.

14

### A.      Fibromyalgia

Thompson claims that her RFC, as determined by the ALJ, is not supported by the record as a whole because the ALJ failed to properly analyze her fibromyalgia. First, Thompson claims that the ALJ's characterization of her symptoms as a "history" of fibromyalgia misstates the severity of her condition. Docket 11 at 23 ("The ALJ's statement that the medical records only indicate a history of fibromyalgia is simply incorrect to the extent it denies a current and active disease process throughout the relevant period."). The court is not persuaded by Thompson's argument because, regardless of the word the ALJ used to describe Thompson's condition, the ALJ considered Thompson's fibromyalgia condition to be severe and ongoing. AR 18. The ALJ did not find Thompson's symptoms credible to the full extent she claimed, but he did not question the continued and current existence of Thompson's fibromyalgia.

Second, Thompson takes issue with what she characterizes as an improper focus on the lack of objective findings and the ALJ's emphasis on flares of fibromyalgia rather than the chronic nature of the disease. Docket 11 at 23. But in reviewing the ALJ's decision, the ALJ did not dismiss Thompson's fibromyalgia for lack of objective evidence as Thompson claims. Rather, the ALJ found that Thompson's fibromyalgia "could reasonably be expected to cause the alleged symptoms; however, the clamant's statements concerning the intensity, persistence and limiting effect of these symptoms are not credible . . . ." AR 21.

Thompson's reliance on *Green-Younger v. Barnhart,* 35 F.3d 99 (2d Cir. 2003), is misplaced. In *Green-Younger*, the court found that the ALJ erred by "effectively requir[ing] 'objective' evidence for a disease [fibromyalgia] that eludes such measurement. As a general matter, 'objective' findings are not required in order to find that an applicant is disabled." *Id.* at 108. Here, the ALJ did not take the position that subjective pain due to fibromyalgia cannot be the basis for a disability because it cannot be objectively diagnosed. Instead, he found that Thompson's claims of disabling pain caused by her fibromyalgia were not fully credible based on the record as a whole. Although the ALJ may consider a claimant's credibility, the ALJ's credibility determination here is incomplete, as discussed below.

### B.      Degenerative Lumbar Spondylosis

The ALJ's decision is inadequate at step four with respect to Thompson's degenerative lumbar spondylosis. While the court will not substitute its own judgment for that of the Commissioner where the Commissioner's decision is supported by substantial evidence, the basis for the ALJ's finding is unclear because the court cannot determine if the ALJ's decision on Thompson's RFC relates only to her fibromyalgia or to her degenerative lumbar spondylosis as well.

Due to the broad and conclusive language used by the ALJ, the court is unable to determine if the ALJ considered Thompson's degenerative lumbar

spondylosis in determining her RFC. The ALJ wrote that "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's *medically determinable impairments* could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC]." AR 21 (emphasis added). Because the ALJ did not find Thompson's degenerative lumbar spondylosis to be a medically determinable impairment, the ALJ's language implies that her degenerative lumbar spondylosis was *not* considered in determining her RFC. On remand, the ALJ should determine Thompson's RFC based on all of her conditions, including her degenerative lumbar spondylosis.

Additionally, the ALJ should also take into consideration Thompson's degenerative lumbar spondylosis when analyzing the credibility of Thompson's complaints of pain. "[W]hen evaluating a claimant's credibility, in addition to considering the absence of objective medical evidence to support complaints of pain, an ALJ should consider a claimant's reported daily activities, the duration, frequency and intensity of his or her pain, precipitating and aggravating factors, medication, and functional restrictions." *Steed v. Astrue*, 524 F.3d 872, 875 n.4 (8th Cir. 2008) (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)). "The ALJ is not required to discuss methodically each *Polaski* consideration, so long

17

as he acknowledged and examined those considerations before discounting [Thompson's] subjective complaints." *Id.* at 876 (internal quotation omitted).

The ALJ based his initial credibility determination largely on Thompson's daily activities. AR 21. While the extent of daily living activities alone does not show an ability to work, those activities may be considered when evaluating a claimant's credibility. *Carlock v. Sullivan*, 902 F.2d 1341, 1343 (8th Cir. 1990). Although activities inconsistent with a claimant's assertion of disability can reflect negatively upon the credibility of the claimant, "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citing *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1989)).

The ALJ's findings regarding Thompson's credibility are insufficient. Because the ALJ omitted Thompson's degenerative lumbar spondylosis from the list of her medically determinable impairments, its omission from the ALJ's RFC and credibility determinations is implied. If the ALJ intended to find that Thompson's claim of disabling pain due to degenerative lumbar spondylosis was not credible, he should have clearly indicated that intent, and the court should not be left to speculate as to the basis for the ALJ's decision. If the ALJ rejects a claim of pain, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons, and the credibility findings must be

18

explicit. *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010) (citing *Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998)).

### C.   Thompson's Smoking

Thompson argues that the ALJ erred in considering her inability to quit smoking as a failure to follow a prescribed treatment plan regarding her asthma. Docket 11 at 24-26. The Commissioner responds that the ALJ reasonably considered Thompson's smoking habit to be inconsistent with her claim of disabling asthma and whether she was credible about the effects of her asthma on her work limitations. Docket 16 at 15-16. The ALJ's opinion stated that Thompson's treating physician strongly recommended that she stop smoking and exercise, and cited to the regulation barring a finding of disability if a claimant fails to follow a prescribed treatment. AR 20. But the ALJ did not make a finding that Thompson was not disabled because she failed to follow treatment prescribed by a treating source. Rather, the ALJ found that Thompson's asthma was not disabling on independent grounds because it did not rise to the frequency or severity required in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 17. Thompson does not contest that finding.

Instead, Thompson argues that the ALJ erred by not accounting for the addictive nature of smoking when evaluating Thompson's RFC. In determining a claimant's RFC, an ALJ takes into account all limitations, viewing the claimant's conditions as a whole. *Paris v. Schweiker*, 674 F.2d 707, 710 (8th Cir. 1982). The

ALJ may consider a claimant's failure to follow a treatment plan when determining whether a claimant is disabled from an impairment that is controllable or amenable. *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997). Because Thompson failed to follow the recommended treatment program of her physician, namely to stop smoking, it was not error for the ALJ to fail to include additional asthma related limitations in her RFC.

### D.    Dr. Fanciullo's Opinion

Under the Commissioner's regulations, a treating physician's opinion is entitled to controlling weight if it is appropriately supported and not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2); *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citing *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)). The ALJ must give good reasons for his or her assessment of the treating physician's opinion. *Reed*, 399 F.3d at 921 (citing 20 C.F.R. § 404.1527(d)(2) [amended in 2012, currently  20 C.F.R. § 404.1527(c)(2)]). The ALJ may give less weight to the opinion of a treating physician if the opinion is inconsistent or poorly documented, undermining the opinion's credibility. *See Vandenboom v. Barnhart*, 421 F.3d 745 (8th Cir. 2005) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). A statement by a medical source that a claimant is disabled or unable to work is an issue reserved to the Commissioner and is not entitled to controlling weight. 20 C.F.R. § 404.1527(d)(1), (3).

20

Thompson argues that the ALJ erred by not giving controlling weight to Dr. Fanciullo's opinion as her treating physician, or alternatively that the ALJ should have contacted Dr. Fanciullo for more information and provided good reasons for not accepting Dr. Fanciullo's opinion. Docket 11 at 26-29. The Commissioner responds that the ALJ need not give any weight to opinions on issues reserved to the Commissioner, and that the ALJ has no duty to develop the opinion of a treating physician once that physician is found unreliable. Docket 16 at 12-14.

Dr. Fanciullo's opinion on whether the claimant is disabled or unable to work is not entitled to controlling weight because that issue is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1), (3). But the ALJ is not free to ignore the opinion on that basis. "[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarifications when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us. . . . [T]reating source opinions are never entitled to controlling or special significance. . . . However, opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p. Furthermore, 20 C.F.R. § 404.1527(c) lays out factors for the ALJ to consider when a treating source

21

medical opinion is not given controlling weight. Instead of following those procedures, the ALJ here merely stated that "[t]he undersigned assigns little weight to [Dr. Fanciullo's] opinion because it is unsupported by the record as a whole. Furthermore, this is an issue that has been reserved to the Commissioner . . . ." AR 22. This process is inadequate. Even though Dr. Fanciullo's opinion is on an issue reserved for the Commissioner, the ALJ should still consider it or give good reasons why he did not.

The Commissioner contends that the ALJ was free to ignore Dr. Fanciullo's opinion because it was inconsistent with other evidence of Thompson's daily activities. The Commissioner points to *Reed v. Barnhart*, 399 F.3d 917 (8th Cir. 2005), for support of this proposition. It is true that the ALJ must consider the supportability of the opinion and its consistency with the record as a whole. SSR 96-5p. Substantial contradictions between the record and a treating physician's opinion can alone be grounds for disregarding that opinion. *See Goff v. Barnhart*, 421 F.3d 785, 790-91 (8th Cir. 2005). But the ALJ here did not give any detail on what he considered to be so inconsistent that he gave little to no weight to a treating source opinion. Furthermore, the court finds an important distinction between the instant case and the inconsistency discussed in *Reed*. In *Reed*, the treating physician gave multiple opinions that were inconsistent with one another. *Reed*, 399 F.3d at 921. In this case, Dr. Fanciullo's opinions were consistent throughout his treatment of Thompson.  If the ALJ does not give any

22

weight to Dr. Fanciullo's opinion, he must state the specific reasons why he finds

it inconsistent and therefore unreliable, and, if necessary, to contact

Dr. Fanciullo to obtain more information on Thompson's specific limitations.

### E.    Medical Opinions as the Basis of Thompson's RFC

Thompson contends that the discrepancy between the Dr. Whittle's

examination report and the RFC as determined by the ALJ implies that the RFC

is not based on a medical opinion. Docket 11 at 29-30. The ALJ found that

Thompson was more limited than Dr. Whittle determined. An ALJ may not draw

his own inferences from medical reports. *Shontos v. Barnhart*, 328 F.3d 418, 427

(8th Cir. 2003). But when determining a claimant's RFC, an ALJ is not limited to

considering only medical evidence. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir.

2007) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)); *Chapo v. Astrue*,

682 F.3d 1285, 1288 (10th Cir. 2012) ("There is no requirement in the

regulations for a direct correspondence between an RFC finding and a specific

medical opinion . . . ."). Because the RFC may change as a result of the errors

made by the ALJ at steps two and three, it would be premature for the court to

address this issue.

## IV.   Step Five

Thompson argues that the ALJ erred by failing to resolve conflicts between

the testimony of the vocational expert (VE) and the Dictionary of Occupational

Titles (DOT) in determining whether a significant number of jobs existed in the

23

national economy for someone with Thompson's RFC. An ALJ has a duty to inquire whether testimony offered by a VE conflicts with the DOT, and when there is an apparent conflict, to elicit a reasonable explanation for the conflict before relying on the VE's testimony. SSR 00-4p. Because the court is reversing the decision of the Commissioner and remanding the matter for reconsideration of Dr. Fanciullo's opinion regarding Thompson's limitations at step four and for reconsideration of Thompson's degenerative lumbar spondylosis at steps two through four, it is premature for the court to address this issue.

## CONCLUSION

Where the ALJ's findings are insufficient or inadequate, remand is appropriate. Following review of the record, the court finds that the ALJ erred at step two because the ALJ failed to consider whether Thompson's degenerative lumbar spondylosis was a severe, medically determinable impairment. The ALJ also erred at step three because he did not determine whether Thompson's degenerative lumbar spondylosis meets or equals a listed impairment. Finally, the ALJ erred in determining Thompson's RFC at step four because the ALJ did not consider Thompson's degenerative lumbar spondylosis and therefore did not properly assess Thompson's credibility about her pain, and because the ALJ failed to follow the proper steps in determining how much weight to give to Dr. Fanciullo's opinion. Accordingly, it is

24

ORDERED that the Commissioner's decision denying Thompson's claim for disability insurance benefits is reversed, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated September 9, 2013.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE